778 A.2d 1064                                                                                        Page 1
**(Cite as: 778 A.2d 1064)**

MHU
Law Library

▷

Supreme Court of Delaware.

Glenn E. MacDONALD, Petitioner Below, Appellant,
v.
STATE of Delaware, Respondent Below, Appellee.

**No. 220, 2000.**

Submitted: March 13, 2001.
Decided: July 27, 2001.
Rehearing En Banc Denied Aug. 21, 2001.

Inmate moved for postconviction relief, seeking to withdraw guilty plea to charges of conspiracy to commit murder and solicitation, which arose from alleged plot to kill witness who testified against inmate with respect to first degree murder charge, for which inmate was confined and awaiting sentencing when conspiracy and solicitation offenses allegedly occurred. The Superior Court, New Castle County, denied relief. Inmate appealed. The Supreme Court, Walsh, J., held that guilty plea was involuntary due to ineffective assistance of counsel.

Reversed and remanded.

West Headnotes
**[1] Criminal Law ⬿1149**
110k1149 Most Cited Cases

The Supreme Court's review of an appeal from the Superior Court's denial of a motion to withdraw a guilty plea is one of abuse of discretion.

**[2] Criminal Law ⬿1134(3)**
110k1134(3) Most Cited Cases

To the extent that the effort to withdraw a guilty plea is premised upon allegations of ineffectiveness of counsel, the Supreme Court carefully reviews the record to determine whether competent evidence supports the court's findings of fact and whether its conclusions of law are not erroneous. U.S.C.A. Const.Amend. 6.

**[3] Criminal Law ⬿1440(1)**
110k1440(1) Most Cited Cases

Postconviction relief movant was not procedurally barred from seeking to withdraw guilty plea based on claim of ineffective assistance of counsel, even though he did not file appeal following his guilty plea; claim of ineffective assistance of counsel was not assertable on direct appeal, but was appropriate in motion for postconviction relief. U.S.C.A. Const.Amend. 6; Superior Court Criminal Rule 61(i)(3).

**[4] Criminal Law ⬿641.13(5)**
110k641.13(5) Most Cited Cases

Defense counsel provided ineffective assistance with respect to defendant's guilty pleas to charges of conspiracy to commit murder and solicitation, which arose from alleged plot to kill witness who testified against defendant with respect to first degree murder charge, for which defendant was confined and awaiting sentencing when conspiracy and solicitation offenses allegedly occurred; counsel conducted no investigation into conspiracy and solicitation charges apart from examination of probable cause sheet supporting defendant's arrest, counsel consented to and even encouraged defendant's placement in solitary confinement, where he remained for four days before being presented with and agreeing to plea agreement, and counsel permitted defendant to surrender not only claim of error that they believed provided strong basis for overturning murder conviction on appeal, but also right to postconviction relief. U.S.C.A. Const.Amend. 6.

**[5] Criminal Law ⬿273.1(1)**
110k273.1(1) Most Cited Cases

While the decision to accept a plea offer is personal to the defendant, that decision must be an informed one, to be made only after full consultation with counsel. Rules of Prof.Conduct, Rules 1.2, 1.3, 1.4.

**[6] Attorney and Client ⬿106**
45k106 Most Cited Cases

Defense counsel is expected to be an advocate for his client in any adversary proceeding, but must function as a counselor as well. U.S.C.A. Const.Amend. 6.

**[7] Criminal Law ⬿641.13(5)**
110k641.13(5) Most Cited Cases

In the area of plea negotiations, the advice of counsel is vital and that duty can be effectively discharged only after defense counsel has investigated the basis for any plea offer. U.S.C.A. Const.Amend. 6; Rules of Prof.Conduct, Rules 1.2, 1.3, 1.4.

**[8] Criminal Law ⬿273.1(2)**
110k273.1(2) Most Cited Cases

A criminal defendant's decision to plead guilty involves the waiver of several important constitutional rights; therefore, in order for a guilty plea to be valid as a matter of due process, an agreement waiving these rights must be entered into knowingly, intelligently, and voluntarily. U.S.C.A. Const.Amend. 14.

**[9] Criminal Law ⬿1026.10(4)**
110k1026.10(4) Most Cited Cases

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*EX.(A).*

**[9] Criminal Law ☞1434**
110k1434 Most Cited Cases

A defendant's plea agreement containing a waiver of the right to appeal or seek postconviction relief does not surrender the defendant's right to argue that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective assistance of counsel. U.S.C.A. Const.Amend. 6.

**[10] Criminal Law ☞641.13(5)**
110k641.13(5) Most Cited Cases

Claims of ineffective assistance of counsel challenge the voluntary and intelligent nature of the plea agreement. U.S.C.A. Const.Amend. 6.

**[11] Criminal Law ☞274(7)**
110k274(7) Most Cited Cases

**[11] Criminal Law ☞641.13(5)**
110k641.13(5) Most Cited Cases

Guilty plea was involuntary due to ineffective assistance of counsel, thus entitling defendant to withdraw plea; counsel failed to fully investigate allegations against defendant, defendant accepted agreement after spending four days in solitary confinement with little sleep, no effort was made to negotiate more favorable plea with state, defendant surrendered viable appeal and postconviction remedies, his sentencing on conviction for which he was confined at time of instant offenses was accelerated, and plea agreement secured no direct benefit to defendant. U.S.C.A. Const.Amend. 6.
*1066 Court Below: Superior Court of the State of Delaware in and for New Castle County, Cr.A. Nos. IN93-03-0550 and 0551.

Appeal from Superior Court. Reversed and Remanded.

Gary F. Traynor, Esquire, Prickett, Jones & Elliott, Dover, Delaware, for Appellant.

Ferris W. Wharton, Esquire (argued) and Thomas E. Brown, Esquire, Deputy Attorneys General, Department of Justice, Wilmington, Delaware, for Appellee.

Before WALSH, HOLLAND, and STEELE, Justices.

WALSH, Justice.

In this appeal from the Superior Court's denial of a motion for postconviction relief, the appellant contends that he should have been permitted to withdraw guilty pleas that he claims he entered into without the effective assistance of

counsel and under conditions of duress. Upon a full review of the record, we conclude that, given the irregularities in the process leading up to the entry of the guilty pleas--including the consent of the defendant's counsel to changing the conditions of the defendant's confinement-- the disputed guilty pleas were neither intelligently nor voluntarily entered with the assistance of counsel. Therefore, the Superior Court abused its discretion in not permitting the withdrawal of the guilty pleas. Accordingly, we reverse.

I

This appeal arises from a criminal prosecution that was the sequence to an earlier prosecution directed against the same defendant, Glenn E. MacDonald ("MacDonald"). The first prosecution began with MacDonald's arrest in 1990 on a charge of first degree murder in the death of MacDonald's former girlfriend, Julie Spencer. MacDonald was twice tried on the murder charge, with the first trial ending in a deadlocked jury. A principal witness against MacDonald was Allan Smith, originally considered a suspect in Spencer's killing. Smith testified that MacDonald had admitted killing Spencer. At a second trial in February 1993, MacDonald was found guilty of first degree murder. Subsequently, his bail was revoked and he was committed to Gander Hill prison to await sentencing, scheduled for May 7, 1993. In the following three weeks, events occurred that resulted in MacDonald's accelerated sentencing on the murder charge, his arrest on new charges of attempted murder and conspiracy to commit murder, pleas of guilty to certain of the new charges, and surrender of his right to appeal the murder conviction. These unusual events are briefly summarized.

Shortly after McDonald's incarceration, a federal agent was contacted by John Foley, another Gander Hill inmate who claimed to have information on a contract "hit" related to MacDonald's trial. Foley had twice previously contacted the same agent offering information regarding stolen credit card activity involving one Garret Markward. The federal authorities had apparently rejected Foley's offer of assistance on those occasions. Foley's latest offer of assistance also related to Markward who, according to Foley, had been suggested to MacDonald as the possible hitman to eliminate Smith. The federal agent relayed this information to the Delaware State Police who, acting with the State prosecutors in MacDonald's murder *1067 trial, made plans to secure evidence against MacDonald on charges of attempted murder.

Because the information relayed by Foley indicated that MacDonald planned to use his wife, Tracy, as the contact with Markward, the police secured a court- authorized wiretap, on March 3, to intercept telephone communications

between MacDonald and his wife, and any other person involved in the alleged conspiracy. Meanwhile, Foley, acting in concert with the police and prison security officers, contacted Markward and arranged for Markward to meet MacDonald's wife in order to receive $2,500--one half of the price allegedly agreed upon for the hit. The police arranged for an undercover policewoman to pose as Tracy MacDonald for a meeting with Markward, who was arrested shortly after the delivery of the partial payment. After his arrest, Markward admitted agreeing to accept $5,000 to rough up Smith, but denied assenting to any plan involving Smith's murder. Later that same day, police intercepted a call from MacDonald to his wife in which MacDonald asked her to meet an individual to discuss financial arrangements for dealing with Smith. Police arranged for an undercover officer posing as Markward to meet with Tracy. During this meeting, Tracy indicated to the undercover officer that the plan was to force Smith to write letters disavowing his trial testimony, to hurt him, and then to make him disappear. Tracy was unable to immediately supply any funds for this purpose, and, after unsuccessfully attempting to secure funds from MacDonald's parents, promised to pay the undercover officer the following day. Police, however, arrested Tracy later that evening on charges of attempted murder first degree, and related conspiracy and criminal solicitation charges. She was committed to prison in default of one million dollars bail.

> On March 5, Foley again contacted the federal agent to relate that MacDonald had learned of the arrest of Markward and his wife, and according to Foley, wanted to pursue other arrangements to harm Smith. That same day MacDonald was arrested on the new charges and, according to the officer who arrested him, agreed to "tell the real story," *i.e.,* to confess to the Spencer murder, and certain of the new charges in exchange for leniency for his family. The prosecutors then contacted MacDonald's defense attorney and, under circumstances not entirely clear, conferred with the trial judge before whom MacDonald's sentencing was pending to advise the judge of MacDonald's post-trial activities. [FN1]

FN1. The transcribed record of the conference reflects the following statement by the prosecutor and comment by MacDonald's counsel:

> We are extremely concerned about Glenn MacDonald's current activities because we have very current; that is, as of approximately an hour and a half ago, information that even given the fact that Glenn MacDonald knows that his wife is now arrested and that the hit man has been arrested, he still wants this done.
>
> I am very concerned and I believe Jeff shares that

concern that we need to request the Court to put Glenn MacDonald or to order the prison, I guess, to put Glenn MacDonald in a situation where he does not have access to a telephone, to the mail, to other inmates to whom he can communicate these types of solicitations.

*  *  *  *

> [Defense Counsel]: I guess what you're saying, you're asking the judge to put him in solitary confinement....

In response to the State's request, the trial judge commented: "I think I'd like to have him shipped off to maximum. How do I go about doing that? Do they have pre-sentence in max?" In response, MacDonald's own counsel offered his view: "Let me make this suggestion. I don't think you even need to do it because if he's *1068 committing crimes over the telephone, he's violating the internal rules of the prison, and they can send him down to solitary on their own initiative." The trial judge commented, "I think I'd like to have him shipped off to maximum" but declined to order MacDonald's transfer in the absence of the necessary documentation. The trial judge encouraged the prosecutors to arrange the transfer to isolation, noting that the Warden of the prison was "a reasonable person." With the apparent agreement of MacDonald's counsel and the State, the trial judge ordered MacDonald's sentencing to be moved up from the originally scheduled date of May 7 to March 11, six days hence.

On the eve of March 5, MacDonald was taken before a Justice of the Peace for his initial appearance on the new charges. Although one of MacDonald's defense counsel appeared with him before the Justice of the Peace Court located at the Gander Hill Prison, he declined to discuss the charges with MacDonald, indicating that he would visit MacDonald at a later time.

After his initial appearance before the Justice of the Peace, MacDonald was immediately transferred from Gander Hill to the Delaware Correctional Center in Smyrna. Upon his arrival there, MacDonald was stripped to his underwear and placed in an isolation cell, measuring 5 feet by 9 feet, and advised that he was being placed on a "suicide watch" [FN2] at the request of his counsel. MacDonald remained in isolation until the next visit from his defense counsel on March 9.

> FN2. Apparently, under a "suicide watch," an inmate is checked for physical movements by a correctional officer every 20 minutes and his cell is illuminated at all times. A concrete pad serves as the bed, except when a mattress is permitted at night. All meals are taken in the cell and the prisoner is permitted no access to other inmates or

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

778 A.2d 1064

(Cite as: 778 A.2d 1064)

the outside world.

After four days of solitary confinement, during which time he had little sleep and no communication with his family or counsel, MacDonald was transported to an interview with his counsel at the maximum security portion of the prison. Following his stay in what is pejoratively referred to as the "hole", MacDonald was, in the words of one of his attorney's, "not a pretty sight." According to MacDonald, his counsel informed him that they had requested the "suicide watch" because he seemed "unstable."

At the outset, his attorneys told him that there had been new developments in his case. Counsel vaguely reported to MacDonald that the police had wiretap recordings, his wife had been arrested, other members of his family were going to be arrested, and new charges against him were forthcoming--including the attempt to murder Smith. During this meeting, which lasted approximately 1 1/2 to 2 hours, and without prior notice to MacDonald, his attorneys presented to him a non-negotiable plea offer from the State. MacDonald's counsel outlined the terms of the offer and stated that there was no time to "hem or haw" in deciding whether to accept. Specifically, the non-negotiable plea offer required that MacDonald:

(1) enter pleas of guilty to two new charges arising out of the alleged conspiracy to harm Smith--criminal solicitation first degree and conspiracy first degree;

(2) provide a videotaped confession of his guilt in the Spencer killing; and,

(3) waive all rights to appeal or to seek postconviction relief with respect to his murder conviction. [FN3]

> FN3. Both of MacDonald's counsel testified that there was at least one claim of error arising out of the murder trial that was a strong basis for appeal. One of MacDonald's lawyers testified that he told MacDonald: "I believe we have a better than even shot of winning on the Doyle issue, the issue is a very strong issue yes."

**\*1069** For its part, the State apparently agreed to give preferential treatment to MacDonald's wife and parents in connection with the "new" charges. [FN4] MacDonald stated that his counsel informed him that there were no defenses to the new charges and that he would be required to "relinquish my appeal rights" in the original murder conviction. Despite his initial rejection of the plea offer, MacDonald eventually agreed to its terms. A prison guard testified that when MacDonald left the meeting with his counsel he was "kind of upset and may been crying."

> FN4. Although the State's offer was not reduced to writing, MacDonald's counsel testified that MacDonald received no direct benefit from the "take it or leave it" plea offer:

Q. He was not exposed, at that point in time, to any penalties harsher than the rest of his life in jail without probation or parole.

It wasn't like that was a compromise on the State's part, was it?

A. Yeah, to the extent that they weren't giving him anything on that. That's absolutely correct.

Q. So he gained nothing personally from a legal sense, from a legal point of view.

A. It's all relative perhaps to what he thinks he gained by getting Tracy out and the other discussions involving his family. To him personally?

Q. Yes, Glenn MacDonald's legal self-interest was not served by this plea.

A. His legal self-interest in my mind does include the other co- defendants. That occurs in any kind of case where you have co-defendants.

To his situation as to what sentence he was going to be serving, he got no benefit from, that's correct.

Later that day, MacDonald's counsel wrote a five page letter to the prosecution in which they related "the events surrounding the Julie Spencer homicide and recent events involving Mr. MacDonald's wife and Garret Markward" based on counsels' meeting earlier that day with MacDonald. The letter related MacDonald's detailed admission to the killing of Julie Spencer; his involvement in efforts to kill or intimidate Smith; the possible involvement of his wife in the new charges; and, his denial that he had ever spoken to his father about the Smith matter. The letter recites that the information contained therein "shall be considered privileged pursuant to the attorney- client relationship and shall remain confidential" but could be disclosed to the Delaware State Police "for the purpose of assisting in the interview of Mr. MacDonald in connection with these events."

That evening, in preparation for a recorded confession, MacDonald reviewed a written outline of the Spencer killing that was prepared by his counsel, and which was consistent with the State's case against him. The following day, March 10, MacDonald was taken to a State Police station to give a videotaped statement. Prior to the arrival of his counsel, MacDonald was permitted to call his parents. In that conversation, later related by a witness who testified at the Rule 61 hearing, MacDonald claimed that he had been threatened with the arrest of his father and that he was going to give a confession that had been essentially written for him.

MacDonald's statement to the police, given in the presence of his counsel and the prosecutor, acknowledged his guilt in the killing of Spencer and his involvement in the plot against Allan Smith. At the beginning of his statement,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

MacDonald made clear that his concern was for his parents and that they would secure lenient treatment in exchange for his statements and guilty pleas. MacDonald requested an acknowledgment from the prosecutor that **\*1070** "my father wouldn't be arrested." The prosecutor responded:

(Prosecutor): *At, at this point we have no reasons to believe your father's involved.* And obviously, down the line if some, for some reason evidence develops that your Dad's involved, and, you know, you're the one that's telling us today. If he's involved tell us today. He'll be taken care of the same way Mom is. Ah, down the line if it develops it would be the same scenario with Dad.

(emphasis supplied). Later, in the same interview, a State Police questioner again raised the specter of family involvement when he prefaced his questioning of MacDonald with the following statement:

Okay. And I know Tracy is in a jam. And your mother's in a jam, and, and, ah, possibly your fath...

The day after he gave his videotaped statement, MacDonald appeared before the trial judge and pleaded guilty to conspiracy to commit murder and solicitation arising out of the Smith matter. The written plea agreement also recited that "Defendant agrees not to pursue an appeal or postconviction relief from his conviction for First Degree Murder." The trial judge engaged in a colloquy with MacDonald in which MacDonald acknowledged his guilt and that he was entering into the plea agreement voluntarily and knowingly, and that he was satisfied with the representation of counsel. One of MacDonald's counsel advised the court that "the resolution of this matter came swiftly and suddenly in terms of tying a complete package up ... that Glenn MacDonald came to decide that for once in his life, he had the opportunity to do the smart thing, and the right thing and tell the truth."

Following acceptance of his plea, MacDonald was sentenced to life imprisonment on the murder conviction and two consecutive five year terms on the new charges. In imposing the sentence, the trial judge commented: "In my sentence, it shall be you who will symbolically disappear into the cold, stark confines of a penal institution where, ultimately you shall die."

In 1996, almost three years after his sentencing, MacDonald, with new counsel, filed a motion to withdraw his guilty plea based on several grounds--including ineffective assistance of counsel. The trial judge recused himself and the motion was assigned to another Superior Court judge. The successor judge conducted a lengthy evidentiary hearing at which several witnesses testified, including MacDonald, his counsel, and the prosecutor. In a post-hearing decision, the Superior Court rejected MacDonald's claim that his guilty plea was involuntary or that he had been denied effective assistance of counsel.

While acknowledging that the conditions of MacDonald's confinement preceding his meeting with counsel on March 9 "were less than ideal," the judge concluded that those conditions did not interfere with "his ability to make knowing and voluntary decisions concerning the situation he was facing." With respect to the claims of ineffective assistance of counsel, the court concluded that MacDonald "had his mind made up before consulting them and they simply reaffirmed his intentions." The court further concluded that, given the nature of the State's "take it or leave it" plea offer, MacDonald's counsel had little time to investigate the new charges and advise MacDonald concerning possible defenses and, thus, their representation was not deficient under the circumstances.

## II

[1][2] Our review of an appeal from the Superior Court's denial of a motion to withdraw a guilty plea is one of abuse of discretion. *See Blackwell v. State,* Del.Supr., 736 A.2d 971, 972 (1999). To the extent that the effort to withdraw a guilty **\*1071** plea is premised upon allegations of ineffectiveness of counsel, however, "we carefully review the record to determine whether 'competent evidence supports the court's findings of fact and whether its conclusions of law are not erroneous.' " *Outten v. State,* Del.Supr., 720 A.2d 547, 551 (1998) (quoting *Dawson v. State,* Del.Supr., 673 A.2d 1186, 1190 (1996)).

[3] Preliminarily, the State argues that MacDonald's claim fails procedurally under Superior Court Rule 61(i)(3) because he did not file an appeal following his guilty plea and thus must demonstrate cause for relief and actual prejudice. This contention was not raised in the Superior Court and ordinarily would not be considered by this Court on review. *See* Del.Supr. Ct. R. 8. The principal and, in our view, dispositive basis for relief advanced by MacDonald is posited upon a claim of ineffective assistance of counsel, a ground not assertable on direct appeal but appropriate in motions for postconviction relief. *See Flamer v. State,* Del.Supr., 585 A.2d 736, 753 (1990). Thus, even if entertained on review, the procedural bar advanced by the State is without merit.

## III

[4] Under the circumstances revealed in this record, the entry of the guilty pleas by MacDonald is problematic in several respects. The most troubling is the atmosphere created by the combined efforts of the prosecutor and defense counsel, with the acquiescence of the trial judge, in arranging for the transfer of the defendant to isolation under a "suicide watch" where he was held for approximately four days. Even if it is assumed that the prosecutor and the trial judge had reason to be concerned about the investigation into MacDonald's attempt to harm a witness, the events

778 A.2d 1064                                                                        Page 6
**(Cite as: 778 A.2d 1064)**

which followed that revelation were extraordinary. On March 5, 1993, MacDonald was in prison pending a presentence investigation with sentencing scheduled for May 7, 1993. Within six days, four of which were spent in solitary confinement, he had been arrested on new charges, confessed and pleaded guilty to the charges of which he had been convicted in addition to the new charges, surrendered his appeal and postconviction rights, and was sentenced to life imprisonment plus ten years.

In denying MacDonald's effort to withdraw his guilty plea, the Superior Court concluded that the plea had been voluntarily entered after full opportunity to receive the advice of counsel. But given the highly unusual circumstances under which that advice was given, the defendant's subsequent waiver of his constitutional rights is open to question.

A.

An attorney has an obligation to fully communicate to his or her client the terms and conditions of proffered plea bargains in criminal cases. *See* Prof. Cond. R. 1.2; *see also* Prof. Cond. R. 1.4. In this setting, attorneys are frequently called upon to advise and consult with their clients in order to assist the client in determining how best to proceed. *See* Prof. Cond. R. 1.2; *see also* Prof. Cond. R. 2.1. An attorney's role in this area of representation is critical and fulfilling that role requires the attorney to act with diligence. *See* Prof. Cond. R. 1.3.

[5][6][7] The American Bar Association has set forth standards that highlight the responsibilities of defense counsel in connection with plea discussions and agreements. Standard 14-3.2 of the ABA Standards for Criminal Justice provides that:

(a) Defense counsel should keep the defendant advised of developments arising out of plea discussions conducted with the prosecuting attorney, and **\*1072** should promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney.

(b) To aid the defendant in reaching a decision, defense counsel, *after appropriate investigation,* should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. *Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.*

ABA, STANDARDS FOR CRIMINAL JUSTICE, PLEAS OF GUILTY, Standard 14-3.2 (3d ed.1999)(emphasis supplied). As the Standard makes clear, the role of defense counsel in the negotiation of guilty pleas is critical. While the decision to accept a plea offer is personal to the defendant, that decision must be an informed one, to be

made only after full consultation with counsel. Defense counsel is expected to be an advocate for his client in any adversary proceeding, but must function as a counselor as well. In the area of plea negotiations, the advice of counsel is vital and that duty can be effectively discharged only after defense counsel has investigated the basis for any plea offer. Here, MacDonald's counsel conducted no investigation into the State's new charges against their client, apart from an examination of the probable cause sheet supporting MacDonald's arrest. In particular, counsel never interviewed MacDonald's parents (whose protection from prosecution was a principal benefit MacDonald was to receive for the plea bargain) to determine whether there was a basis for a viable prosecution against them. [FN5]

> FN5. Courts have looked askance at plea agreements that benefit third parties. In *Bordenkircher v. Hayes,* 434 U.S. 357, 363 n. 8, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), the Supreme Court noted that "adverse or lenient treatment for some person *other* than the accused ... might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks defendant must consider." Where threats to prosecute third persons form part of plea negotiations there must be probable cause to support the crimes contemplated to be charged and courts accepting a plea under such circumstances must take special care to assure the voluntariness of such a plea. *See United States v. Nuckols,* 5th Cir., 606 F.2d 566, 570 (1979).

While the State's take it or leave it plea offer obviously created little room for negotiation, the very nature of that offer required that counsel investigate fully the basis for the State's new charges and the prospect that the prosecution against MacDonald's parents was a negotiable matter. In effect, MacDonald's counsel accepted the State's case at face value and permitted their client to surrender a meritorious appeal claim and the entitlement to postconviction relief for a benefit which was, at best, vague and indefinite. Even the State concedes that it had no real basis for prosecuting MacDonald's father (although it equivocated on this point in securing MacDonald's statement) and no direct evidence that MacDonald's mother was involved in the conspiracy against Smith.

B.

Apart from the lack of sufficient investigation, we are quite troubled by defense counsel's participation in, even encouragement of, the efforts of the State and the trial judge to change the conditions of their client's incarceration. The record of the office conference between the trial judge, the prosecution, and defense counsel that occurred on March 5, 1993, without MacDonald's knowledge, is remarkable in

several respects. The conference occurred at a time when MacDonald was awaiting a presentence investigation and there were no other matters relating to his *1073 murder conviction before the court. The conference was requested by the prosecution to advise the trial judge of the "new information" it had uncovered concerning MacDonald's effort to eliminate or intimidate a witness in his previous trial. As the prosecutor made clear in that conference, "we are not totally finished investigating as of this moment." Despite these tentative results, however, the State proceeded to describe MacDonald's conduct to the judge who would have the responsibility to sentence him, and before whom the guilty pleas were ultimately entered. [FN6] To add to these unusual circumstances, defense counsel, who had conducted no investigation of the new charges and made no objection to the prosecution's relating to the trial judge investigative information adverse to their client, acquiesced in a plan to have their client placed in isolation. Given the effect of these conditions on the defendant over four days, they assisted in creating an onerous climate in which their client could not intelligently evaluate the State's plea offer. Defense counsel's consent to the extreme conditions of their client's confinement can hardly be viewed as serving MacDonald's best interests.

> FN6. While we express no definitive opinion on the matter, we are troubled by the trial judge's receipt of information adverse to the interests of a defendant pending sentencing, even in the presence of defense counsel. It is also a matter of concern that the trial judge accepted the defendant's plea after participating in arrangements to impose severe conditions of confinement during plea negotiations and after becoming enmeshed in the investigative stage of the second set of charges. Wisely, the trial judge recused himself from participating in the Rule 61 proceedings in which the defendant sought to withdraw his guilty pleas.

C.

A third factor that suggests counsel did not effectively serve their client's interests is the terms of the plea agreement itself. As previously noted, counsel permitted their client to surrender a claim of error that they believed provided a strong basis for overturning MacDonald's conviction on appeal. More importantly, defense counsel permitted MacDonald to surrender his right to postconviction relief, which presumably included the right to claim ineffective assistance of counsel in the events leading up to his sentencing. Under these circumstances defense counsel were, in effect, insulating themselves from a claim that they rendered deficient service to their client and thus created a conflict of interest.

As an initial matter, this Court has never directly opined on whether, as a component of plea negotiations, a defendant may waive the right to appeal or seek postconviction relief. Most states have held that there is no bar to waiver of appeal rights as part of a plea agreement. In Maryland, for example, waiver of the right to appeal a criminal conviction is permitted so long as it is knowing and voluntary. *See Cubbage v. State,* 304 Md. 237, 498 A.2d 632 (1985); *see also, e.g., Brown v. Haynes,* W.D.Mo., 385 F.Supp. 285 (1974); *Gwin v. State,* Ala.Crim.App., 456 So.2d 845 (1984); *Staton v. Warden,* 175 Conn. 328, 398 A.2d 1176 (1978); *People v. Fearing,* 110 Ill.App.3d 643, 66 Ill.Dec. 378, 442 N.E.2d 939 (1982); *Majors v. State,* Ind.App., 568 N.E.2d 1065 (1991); *State v. Hinners,* Iowa Supr., 471 N.W.2d 841 (1991); *State v. Gibson,* 68 N.J. 499, 348 A.2d 769 (1975); *Blackburn v. State,* 170 W.Va. 96, 290 S.E.2d 22 (1982). The rationale for permitting waiver of appeal rights is that because a defendant may waive significant constitutional rights--including trial by jury and the right to counsel--a defendant may also waive the right to appeal, provided the waiver is knowing, intelligent and voluntary. *See Cubbage,* 498 A.2d at 638; *1074 see also United States v. Rutan,* 8th Cir., 956 F.2d 827, 829-30 (1992). Courts permitting the waiver of a defendant's right to seek postconviction relief have applied this same analysis. *See, e.g., Watson v. United States,* 6th Cir., 165 F.3d 486, 488-89 (1999); *United States v. Wilkes,* 5th Cir., 20 F.3d 651, 653 (1994). To the contrary, Michigan and Arizona have adopted the *per se* rule that the right to appeal may not be waived as part of a plea agreement, reasoning generally that, as a matter of policy, the right to appeal is so vital for the protection of other rights that it should not be negotiable. *See People v. Butler,* 43 Mich.App. 270, 204 N.W.2d 325 (1972); *see also State v. Ethington,* 121 Ariz. 572, 592 P.2d 768 (1979)(stating that public policy forbids "a prosecutor from insulating himself from review by bargaining away a defendant's appeal rights"). It is unnecessary, however, to decide in this case the contours of a waiver of appeal rights incident to plea negotiations. The critical issue before us is whether the waiver of MacDonald's right to appeal or seek postconviction relief, [FN7] even if permissible, was the result of ineffective assistance of counsel, thereby rendering his plea invalid.

> FN7. Interestingly, the State did not challenge MacDonald's Rule 61 motion for postconviction relief on the ground that he effectively waived his right to seek postconviction relief under the terms of the plea agreement.

IV

[8][9][10] A criminal defendant's decision to plead guilty involves the waiver of several important constitutional rights. Therefore, in order for a guilty plea to be valid as a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

matter of due process, an agreement waiving these rights must be entered into knowingly, intelligently, and voluntarily. A defendant's plea agreement containing a waiver of the right to appeal or seek postconviction relief does not surrender the defendant's right to argue that the decision to enter into the plea was not knowing and voluntary because it was the result of ineffective assistance of counsel. *See DeRoo v. United States,* 8th Cir., 223 F.3d 919, 923-24 (2000). Indeed, "[c]laims of ineffective assistance of counsel ... challenge the voluntary and intelligent nature of the plea agreement." *United States v. Ruiz,* 9th Cir., 241 F.3d 1157, 1165 (2001). As one court has commented: "[j]ustice dictates that a claim of ineffective assistance of counsel in connection with the negotiation of [an] agreement cannot be barred by the agreement itself--the very product of the alleged ineffectiveness." *Jones v. United States,* 7th Cir., 167 F.3d 1142, 1145 (1999).

Most federal courts permit the waiver of the right to appeal or seek postconviction relief in a plea agreement except when the waiver would bar a claim that the guilty plea was the result of ineffective assistance of counsel. *See, e.g., United States v. Black,* 10th Cir., 201 F.3d 1296, 1301 (2000); *Jones,* 167 F.3d at 1145; *DeRoo,* 223 F.3d at 923-24; *United States v. Henderson,* 5th Cir., 72 F.3d 463, 465 (1995). To determine whether an appeal or postconviction relief withstands a waiver in a plea agreement based on a claim of ineffective assistance of counsel, the Tenth Circuit applies a test based on the Supreme Court decision in *United States v. Broce,* 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989), which requires a guilty plea to be both voluntary and counseled. *See United States v. Cockerham,* 10th Cir., 237 F.3d 1179, 1187 (2001). Pursuant to this two- pronged test, it must be determined: (i) "whether there is any basis for a claim of ineffective assistance of counsel," and (ii) "whether that ineffectiveness claim pertains to the validity of the plea." *Cockerham,* 237 F.3d at 1187.

The oft-stated test for evaluating the effectiveness of counsel requires the **\*1075** Court to engage in a two-pronged analysis: (i) whether "counsel's representation fell below an objective standard of reasonableness" and (ii) whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Riley v. State,* Del.Supr., 585 A.2d 719, 726 (1990). The burden of proving ineffective assistance of counsel is on the party asserting it. Where the claim arises in the context of a guilty plea, the defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *see also Albury v. State,*

Del.Supr., 551 A.2d 53, 58 (1988).

[11] The State argues, as the Superior Court concluded in denying MacDonald's motion to withdraw his guilty plea, that the plea agreement was the result of MacDonald's insistence. In short, the State contends that the decision was MacDonald's, not his counsel's. This argument overlooks the vital role played by defense counsel in advising a client with respect to the entry of a guilty plea. We believe, consistent with the ABA standards, that the right to counsel includes the right to informed advice after "appropriate investigation." ABA, STANDARDS FOR CRIMINAL JUSTICE, Standard 14-3.2. In *Strickland,* the Supreme Court noted that the ABA Standards for Criminal Justice ("The Defense Function") are guides or norms of practice for determining whether counsel's assistance was reasonable. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. In applying the reasonableness or competence prong, "the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* at 690, 104 S.Ct. 2052. On the record, we reluctantly conclude that MacDonald's counsel did not provide the required adversarial testing of the State's efforts to have MacDonald abandon his appellate rights and plead guilty to new charges.

In this case, prior to meeting with their client, MacDonald's counsel failed to fully investigate the allegations against their client. MacDonald's counsel did not question the State's informant, MacDonald's wife, or his parents. Indeed, it appears that his attorneys did not even seek an explanation from MacDonald as to what had transpired. Counsel merely stated that MacDonald had no defenses to the current charges. One of his attorneys even admitted that he "did not offer [MacDonald] professional advice as to whether he should accept the plea offer." MacDonald's counsel only made clear that he had no choice other than to accept the State's offer, without modification, or reject it outright. There were no plea negotiations in this case and no effort was made to negotiate a more favorable plea with the State. Given the conditions of the defendant's confinement, which, were in effect with his counsel's acquiescence, the lack of investigation, the surrender of viable appeal and postconviction remedies, the acceleration of the sentencing process and the lack of direct benefit secured in the plea agreement, we conclude that the defendant's plea of guilty was not the product of the competent advice of counsel. [FN8] In the absence of such advice, the **\*1076** plea agreement lacks the necessary elements of intelligence and voluntariness and cannot withstand collateral attack.

> FN8. The hasty arrangements for MacDonald's guilty plea and the acceleration of his sentencing also placed him at a significant procedural

disadvantage. Under Superior Court Criminal Rule 32(d), a motion to withdraw a guilty plea after sentencing will be granted only to correct "manifest injustice"--a higher standard than would have resulted had MacDonald reconsidered his plea agreement before his previously scheduled date for sentencing--May 7, 1993.

Our invalidation of the defendant's guilty plea on the basis of ineffective assistance of counsel is not intended as a reflection of the general professional standing of his trial counsel--both of whom are seasoned criminal law practitioners who have rendered able assistance to their clients in many cases in the Superior Court and in this Court. Unfortunately, in this highly unusual case, counsel permitted themselves to become allies with the prosecution in an effort to prevent their own client from committing further offenses and, thereafter, were persuaded that MacDonald's best interests lay in speedily resolving all the charges--both those awaiting sentencing and those not indicted--pending against their client. But, by any objective standard, permitting a client to enter into an onerous plea agreement under adverse conditions of confinement without appropriate investigation cannot be viewed within the range of effective assistance of counsel.

As previously noted, objectively considered, the services rendered by MacDonald's counsel, from the time of his arrest on the new charges to the entry of his guilty plea, clearly fell below the standard expected of competent defense counsel. Permitting their client to give up viable appeal rights, postconviction remedies, and plead to new charges in an atmosphere of haste and coercion without proper investigation was objectively unreasonable. The record in this case also supports the defendant's claim that, had he received proper advice and assistance from counsel, he would not have surrendered trial and appellate rights in exchange for State promises that were of no direct benefit to him. Thus, we are satisfied that ineffective assistance of counsel has been demonstrated on this record.

We conclude that the plea agreement entered into by the defendant and the guilty pleas that followed must be set aside as not voluntary and intelligently entered because of the ineffective assistance of counsel. Accordingly, the decision of the Superior Court is REVERSED. Implicit in our ruling invalidating MacDonald's guilty pleas is the requirement that he be resentenced on the murder conviction. This will ensure his entitlement to file a timely appeal. *See Braxton v. State,* Del.Supr., 479 A.2d 831 (1984). Our ruling does not affect the convictions for which the defendant was awaiting sentence nor does it affect the prosecution for any subsequent offenses which were pending at the time of the entry of the guilty pleas now invalidated. This matter is REMANDED for further proceedings consistent with this decision.

778 A.2d 1064

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works